**United States Federal District Court**
**District of Columbia**
**Civil Division**

| | | |
|---|---|---|
| **Samuel Otis Pratt** | ) | |
| **179 Ala Street** | ) | |
| **Asmara, Eritrea** | ) | |
| **Plaintiff** | ) | **Case No. 16-2216** |
| | ) | |
| **vs.** | ) | <u>Jury Demand</u> |
| **John F. Kerry, Secretary of State.** | ) | |
| **U.S. Department of State** | ) | For violations of Section1981, Title VII & the |
| **2201 C. Street. NW.** | | Age Discrimination in Employment Act. |
| **Washington DC 20522** | | |
| **Defendant.** | | |

## <u>Introduction</u>

The Plaintiff Samuel Pratt is a U.S Citizen currently employed as a Management Officer with the U.S. Embassy in Asmara, Eritrea.

While here, he complained about discrimination, hostile work environment and retaliation by the Charge D'Affairs Louis Mazel and Lori Peterson Dando, the Deputy Chief of Mission (DCOM) of the embassy. Pratt now brings an action under Section 1981, Title VII and the Age Discrimination in Employment Act. He has since also filed a complaint with the U.S. Office of Special Counsel (OSC) regarding improper use of federal funds and property, and may have also already filed with the Office of Inspector General (OIG)[1]. The Defendant U.S Department of State is being placed on notice, that Samuel Pratt will therefore also be filing an amendment in this Court for an action under the Whistleblower Protection Act (WPA)[2].

---

[1]  The Plaintiff is currently in Africa, and we do not always have timely or regular communication with our client.

[2]  This court has subject matter jurisdiction for his Whistleblower Protection Act (WPA) claims under 5 U.S.C. § 7702, which provides this Court with jurisdiction for actions under the WPA, for claims that Pratt could have also brought with the Merit Systems Protection Board (MSPB). *See Sagar v. Lew*, 2016

**Part I. Parties**

1.   Samuel Otis Pratt is an African-American male, age 60. He is a U.S Citizen and a Management Officer at the U.S Embassy in Eretria.  He is an employee under 42 U.S.C § 2000(e) *et seq* under Title VII.

2.   John F. Kerry is the Secretary of the U.S Department of State, the federal agency and defendant in this action. The Agency is an employer under 42 U.S.C § 2000(e) *et seq* under Title VII.

**Part II. Exhaustion of Administrative Remedies**

3.   Pratt files this action in Court, after exhausting his administrative remedies by filing with the State Department Equal Employment Opportunity (EEO) office and by filing a claim with the Equal Employment Opportunity Commission (EEOC).

4.   On August 9, 2016, the Report of Investigation was received by Pratt, EEOC Case Number DOS-0125-16.

5.   On Friday November 4, 2016, we filed the instant complaint or well within the 90 days to do so.

---

U.S. Dist. LEXIS 135594, *10 (D.D.C. Sept. 30, 2016) ("But the district court does have jurisdiction over a WPA claim when it is brought as part of a "mixed case." A case is "mixed" if (1) the employee "has been affected by an action which [he] may appeal to the [MSPB]," including, potentially, an agency reprisal prohibited by the WPA; and (2) the employee alleges that the action was also motivated by certain types of unlawful discrimination, including discrimination prohibited by the ADEA. 5 U.S.C. § 7702(a)(1).")

**6.** In 2016, Pratt also filed a complaint under the whistleblower protection act with the U.S. Office of Special Counsel. (OSC). He may have also previously filed a complaint with the Office of Inspector General (OIG).

**7.** There are no administrative requirements under Section 1981.

**8.** Plaintiff has no other administrative obligations.

### Part III. Jurisdiction & Venue

**9.** This Court has jurisdiction of this action under 28 U.S.C. §1331, 28 U.S.C §1343 (4) and 42 U.S.C. §2000(e)-(5) f in order to protect rights guaranteed by 42 U.S.C §1981, and Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000 (e) *et.seq*[3].

**10.** Venue is proper in Washington D.C., because Pratt engaged in protected activities in Washington D.C., and his personal file and other records are also located in Washington D.C.

### Part IV. Statement of Facts

**11.** Samuel Pratt has been an employee of the U.S. State Department since 1986.  He is an African-American male age 60. During his 20 years with the State Department and the Foreign Service, Pratt has received numerous awards including many "Superior Honor Awards" from the Agency.

**12.** On August 2014, Pratt reported to the U.S. Embassy in Eritrea as the Management Officer (MO) for the embassy. Eretria is considered a high threat posting because of the many security risks to embassy and US personal, in the Horn of Africa.

---

[3] As we mentioned in fn.1, this Court will also have jurisdiction over his claims under the Whistleblower Protection Act under 5 U.S.C. § 7702 *et seq*, when in here, Pratt is also alleging violations of Title VII and Section 1981, and when he also suffered adverse employment actions appealable to the Merit Systems Protection Board (MSPB).  *See Butler v. West*, 164 F.3d 634, 638, (D.C. Cir. 1999)

**13.** As part of his duties, Pratt was to procure a public diplomacy building for use by the embassy staff.

**14.** Louis Mazel is a Caucasian Jewish male. Mazel is the Chief of Mission (COM) or the Charge d'Affairs at the embassy in Eritrea.  Lori Peterson Dando, is a Caucasian female and Deputy Chief of Mission (DCM) at the embassy in Eritrea. Dando was Pratt's first level supervisor, while Mazel was Pratt's second level supervisor.

**15.**  In August 2014, or at the time of Pratt's arrival in Eritrea, the embassy staff was working from a small 900 square feet office. Pratt then acquired an approximately 6500 square feet public diplomacy building. The embassy would also need to spend $150,000 in renovation costs, so that the building could be made habitable. This building was acquired and the renovation costs were expensed. Soon after, this public diplomacy building opened to staff embassy personal.

16. Almost as soon as it was opened, it was also closed down by the Eritrean Ministry of Foreign Affairs (MFA) because the U.S. embassy staff were engaging in activities unauthorized by the MFA. .

17. Pratt however was told by his superiors, that the new building was shut down, because the original landlord had failed to submit the necessary papers with the MFA authorizing the sale to the Americans.

18. Pratt disputed this allegation and submitted emails and other documents, showing that all necessary papers were filed with the MFA by the landlord.

19. In the Summer/Fall of 2014, Pratt met with the Deputy Chief of Mission Dando, and the Charge d'Affaires Mazel and informed them that it is against agency regulations for the "Google hiking club" made up of Embassy personal to use the embassy's internal internet

or "OpenNet Network" to upload pictures and sale items, as it subjects sensitive and classified embassy documents to hackers, virus' and malware.

20. Dando reprimanded Pratt, informing him that these communications were being used for diplomatic purposes.

21. During this time, Pratt also informed Dando, that the embassy should not be providing free internet for use at the residences, housing embassy personal. Under Agency policy, internet use must be paid for. Pratt suggested that embassy personal reimburse the agency for the use of the internet. Dando refused the request.

22. In November 2014, the Charge d'Affairs Mazel asked Pratt to authorize and purchase solar panels for use at the residences and the chancery. Pratt informed Mazel that these expenditures must be approved by the Office of Budget and Operations (OBO) first. Pratt contacted the OBO without success. Mazel then instructed Pratt to purchase solar panels from the embassy's funds. Pratt objected but made the purchase.

23. In March 2015, Pratt informed Dando and Mazel, that it is against agency regulations to purchase frozen food from another country. Frozen food was being purchased from South Africa, France and Belgium. The food was being purchased on behalf of certain international NGOs, and the embassy was incurring the freight charges for the purchase. Employees were also using their allowances to pay for the freight. This practice was against agency guidelines and regulations. When Pratt confronted Dando about this, Dando called the State Department in Washington D.C., who told her that the purchase was improper. Dando however continued with the purchase.

24. In June 2015, Dando told Pratt to procure expenses for the installation of new toilet seats at the residences of the embassy staff. Dando felt that the quality of the toilet seats was

poor and therefore needed to be upgraded. Dando asked Pratt to have the Eritrean landlord

pay for the upgrade. The landlord refused, and only agreed to it if the embassy were to pay

half of the costs associated with the upgrade.  Pratt informed Dando that there was no need

for an upgrade as the toilet seats were in functioning order; he also informed Dando that it

would be a wasted expense. Dando reminded Pratt that she is the Deputy Chief of Mission

and if she wants an upgrade, Pratt is to immediately comply with her request and not

question her. Dando also informed Pratt that the Charge d'Affairs Mazel had agreed to the

purchase.

25. In August 2015, Pratt was told by Mazel to purchase individual barbeque grills for the

residences, and additional grills for the chancery for the upcoming "Sports Day" activities.

Pratt informed Mazel that he could not purchase individual barbeque grills for each

residence, but that he (Pratt) could purchase a barbeque grill for the residence for common

use. Mazel told Pratt to not question him.

**October 30, 2015 Protected Activity**

26. On October 30, 2015, Pratt engaged in protected activity in a meeting attended by Mazel,

Dando and Office Manager Specialist Pamela Loring. The meeting was from 8:20 am to

10:20 am.

27. In this meeting, Pratt alleged that Mazel and Dando were not informing him of tasks and

events at the embassy and that Pratt felt that the withdrawing of duties from him was

discriminatory. He also told them that by withdrawing tasks or withholding information, it

made it difficult for him to do his job. For instance, Pratt alleged that as the Management

Officer, his duty was to review all bidders (employment applications) for positions at the

embassy. He informed Dando that she had removed him from this task, and without obtaining his input, Dando had also finalized the applicant pool with Washington D.C.

28. Mazel[4] who was present at this meeting, informed Dando she should not have finalized the applicant list without Pratt's review.

29. Pratt also informed Mazel and Dando that he was not being informed of visitors to the embassy for visa applications. Pratt again reiterated that he felt that the actions of Mazel and Dando were discriminatory and/or in retaliation of his prior whistleblowing activities. He also informed his supervisors that the taking away of his tasks and duties, made it difficult for him to do his job.

30. Pratt also subjectively believed that he was complaining about discrimination, hostile work environment and retaliation.

31. Pratt further alleged improper vehicle use by Mazel and Dando, and that embassy vehicles were not authorized for weekend hikes. Pratt said that in order for this practice to continue, it needed to be approved by Washington D.C and the necessary waivers needed to be obtained. Pratt also told Dando that asking the commanding officer for furniture deliveries to her (Dando) residence was also improper, as it needed to go through the necessary inventory controls and channels. Pratt also told Dando that her husband (Steve Dando) had no authority to direct embassy staff for errands.

32. Dando was visibly agitated and left the meeting, citing that the discussion was focusing on her husband (Steve Dando), and to avoid nepotism, she was withdrawing from this meeting.

---

[4] Louis Mazel is the Chief of Mission and Charge d'Affairs at the embassy.

33. Mazel agreed with Pratt that the delivery of furniture to Dando was improper and that he was not aware of the practice.

34. Pratt ended this meeting by saying that he is seeking equality in treatment, that he not be discriminated against in regards to duties and assignments, and that the actions by Mazel and Dando seem to indicate retaliation for his prior whistleblowing activities and concerns.

35. Pratt also informed his supervisors that he felt that both Mazel and Dando had a closer relationship with the white staff, who were also being treated better at the workplace.

36. In November 2015, Pratt again brought to the attention of Mazel, that embassy staff were getting drunk and obnoxious with their local boyfriends, and in the process losing American passports, drivers licenses, security keys, and identification cards. All of these acts was a security breach and a cause of concern for the embassy; more so when in here, American passports and identification cards were being lost at a location that was a hotbed for terrorism[5].

37. Sometime in February 2016, the embassy was using its facilities for a yoga group, a hiking group and a play group. These groups gathered at the embassy compounds 2-4 times a week. Dando had authorized these non-embassy personal to also use the lockers within the embassy. Contrary to agency policy, no waivers for the use of the lockers were obtained. Pratt brought this to the attention of Mazel, and that it was against department policy to do

---

[5]  In the State Department's "Country Report for Terrorism 2015" it says that "The Government of Eritrea has been under UNSC [United Nations Security Council] sanctions since December 2009 as a result of past evidence of support for al-Shabaab and regional destabilization. UN Security Council Resolution (UNSCR) 1907 (2009) and 2013 (2011) continued an arms embargo on Eritrea and a travel ban and asset freeze on some military and political leaders, calling on the nation to "cease arming, training, and equipping armed groups and their members, including al-Shabaab, that aim to destabilize the region." https://www.state.gov/j/ct/rls/crt/2015/257514.htm (last visited November 4, 2016)

Pratt v. State Dept, Kerry Secretary of State
Dhali PLLC
8

so.  Pratt also felt that it was reckless for Dando to allow unauthorized and unknown individuals who had not undergone a security clearance to place their unknown items in the embassy locker.  Any individual could place a bomb or other destructive device in these lockers causing harm to embassy and American personal.

38. On February 8, 2016, Pratt informed his supervisors that he was going to contact the State Department's EEO office to file a claim of discrimination and retaliation.

39. Barely 24 hours later or February 9, 2016, Pratt received a letter of admonishment from Dando; for some odd reason it was also dated February 12, 2015, or a year prior.

40. On February 10, 2016, Pratt received the same letter of admonishment this time with the correct date or February 10, 2015.

**Pratt is denied the position as Deputy Chief of Mission because Dando does not trust him.**

41. Sometime in April 2016, Pratt was also denied the Deputy Chief of Mission (DCM) position within the embassy because Dando told Pratt, "you are disrespectful, insubordinate and I don't trust you.[6]" Prior to his protected activities, Pratt was the DCM on three (3) occasions at the embassy.

42. Also in April 2016, he received a negative employee evaluation report (EER). Pratt was troubled by this report, for as late as December 8, 2015, he was told by his supervisors of his positive contribution at the workplace.

43. Pratt believes that he was denied the DCM and was given a negative evaluation because of his protected activities.

---

[6] EEOC Investigative Report, pg. 20 of 31 (August 1, 2016)

44. Both the negative evaluation and the non-assignments to the DCM position effected Pratt's future earning potential. In the case of the April 2016 negative employee evaluation, it is Agency policy to recommend a raise or a promotion based on a history of positive employee evaluations.

**Loring avers that management has been demeaning to Pratt, has withheld assignments and are committing waste and fraud at the embassy.**

45. As part of the EEO Investigation, Pamela Loring, Office Management Specialist to Mazel was interviewed. In her affidavit, she avers that she witnessed demeaning conversations by Mazel and Dando against Pratt. Loring also avers that she has witnessed Mazel prepare the embassy budget without allowing Pratt to review or clear it. Loring brought this to Mazel's attention, at which point, Mazel allowed Pratt to review the budget.

46. Loring in her affidavit also says, that Pratt has done a "superior job at his post as the Management Officer and the Front Office COM [Chief of Mission, Mazel] and DCM [Deputy Chief of Mission, Dando] should be in trouble for skirting the rules and regulations of the Department creating much waste, fraud and abuse, and continuously berating and punishing Complainant [Pratt] for not going along.[7]"

### Part V. Causes of Action

### Count I. Race Discrimination Under Section 1981

47. Plaintiff reincorporates by reference all the allegations above.

48. Defendant intentionally discriminated against Plaintiff on account of his race, Black or African-American, in violation of 42 U.S.C. § 1981 by denying him equal terms and conditions of employment.

---

[7] Report of Investigation, pg. 20 of 21.

49. Plaintiff's discrimination was not experienced by other non-Black employees of the Defendant.

50. Defendant's intentionally interfered with Plaintiffs contract of employment because of their discriminatory animus towards his race. Defendant acted in a willful and wanton manner and in callous disregard for the federally-protected rights of the Plaintiff.

51. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by the discriminatory treatment.

52. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

**Count II. Hostile Work Environment & Harassment Under § 1981**

53. Plaintiff alleges and incorporates all the paragraphs above.

54. Defendant created a hostile work environment and/or harassed Plaintiff because of his race, Black, the offending conduct was unwelcome, was based on his race, was sufficiently server or pervasive when it altered the conditions of his employment and created an abusive work environment and was imputable to the employer.

55. Plaintiff here suffered tangible employment actions from his supervisors when he was unable to perform his job when the Defendant stripped him of his employment duties.

56. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by the harassment.

57. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

### Count III. Retaliation Under § 1981

58. Plaintiff alleges and incorporates all the above paragraphs.

59. Plaintiff engaged in protected activity and opposition to practices made unlawful under Section 1981 while employed by Defendant.

60. As a result of his protected activity and opposition to practices made unlawful under Section 1981, Plaintiff was subjected to an adverse employment action, upto and including non-assignment of duties and responsibilities.

61. A casual connection exists between Plaintiff's protected activity and the adverse employment actions taken by Defendant.

62. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of

employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress from the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by their actions.

63. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

**Count IV. Race & Sex Discrimination Under Title VII.**

64. Plaintiff alleges and incorporates all the above paragraphs.

65. Title VII prohibits discrimination on the basis of race and sex.

66. Defendant discriminated against the Plaintiff on the basis of his race African American and sex male, by denying the Plaintiff equal terms and conditions of employment.

67. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by Defendants' actions.

68. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## Count V. Hostile Work Environment & Harassment Under Title VII

69. Plaintiff alleges and incorporates all the paragraphs above.

70. Defendant created a hostile work environment and/or harassed Plaintiff because of his race, Black, and sex male. The offending conduct was unwelcome, was based on his race, and sex, was sufficiently server or pervasive when it altered the conditions of his employment and created an abusive work environment and was imputable to the employer.

71. Plaintiff here suffered tangible employment actions from his supervisors when he was unable to perform his job when the Defendant stripped him of his employment duties.

72. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by the harassment.

73. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## Count VI. Retaliation Under Title VII.

74. Plaintiff alleges and incorporates all the above paragraphs.

75. Plaintiff engaged in protected activity and opposition to practices made unlawful under Title VII, while employed by Defendant.

76. As a result of his protected activity and opposition to practices made unlawful under Title VII, Plaintiff was subjected to an adverse employment action, upto and including non-assignment of duties and responsibilities.

77. A casual connection exists between Plaintiff's protected activity and the adverse employment actions taken by Defendant.

78. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress from the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by their actions.

79. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

**Count VII. Age Discrimination Under the Age Discrimination Employment Act**

80. Plaintiff re-alleges and incorporates by reference the allegations of all the paragraphs above as though fully set forth herein.

81. Under the Age Discrimination in Employment Act ("ADEA"): It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; and/or (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age. *See* 29 U.S.C. § 623.

82. At all times Defendant was an employer subject to the provisions of the ADEA.

83. At all pertinent times, Plaintiff was an African-American male age 40 or older entitled to protection under the ADEA.

84. The ADEA prohibits discrimination in employment based on age.

85. By treating the Plaintiff less preferably than similarly situated younger workers, the Defendant are in violation of the ADEA.

86. Defendant's actions gives rise to an inference of discrimination and that Defendant knew or should have known of the age discrimination that Plaintiff suffered. Defendant's conduct has been intentional, deliberate, willful and in callous disregard of Plaintiff's rights.

87. Defendant's acts of age discrimination caused the Plaintiff to suffer economic losses, mental and emotional distress, embarrassment, humiliation and indignity.

88. This intentional, reckless and/or willful discrimination on the part of Defendant constitutes a violation of Plaintiff's rights under the ADEA.

89. Having suffered from Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under the ADEA.

### Count VIII. Hostile Work Environment Under the ADEA

90. Plaintiff reincorporates by reference all the allegations above.

91. Defendant created a hostile work environment and/or harassed Plaintiff because of his age. The offending conduct was unwelcome, was based on his age was sufficiently severe or pervasive when it altered the conditions of his employment and created an abusive work environment and was imputable to the employer.

92. Plaintiff here suffered tangible employment actions from his supervisors when he was unable to perform his job when the Defendant stripped him of his employment duties.

93. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by the harassment.

94. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

### Count IX. ADEA Retaliation

95. Plaintiff reincorporates all the allegations from the paragraphs above.

96. Plaintiff engaged in protected activity and opposition to practices made unlawful under the ADEA while employed by the Defendant.

97. As a result of his protected activity and opposition to practices made unlawful under the ADEA, Plaintiff was subjected to an adverse employment action, in this case when he was

given a negative performance evaluation and was denied the position of the Deputy Chief of Mission, both of which effected his earning potential.

98. A casual connection exists between Plaintiff's protected activity and the adverse employment actions taken by the Defendant.

99. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of the Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by his wrongful termination and the resultant financial hardship.

100. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## Part VI. Relief Sought

WHEREFORE, the Plaintiff Samuel Otis Pratt respectfully requests this Court award economic damages to be proved at trial, and in addition:

A. Enter judgment for the Plaintiff Samuel Otis Pratt against Defendant U.S. Department of State, on all counts, in an amount no less than five hundred thousand dollars ($500,00.00)

B. Declare that the conduct of Defendant is in violation of Title VII, Section 1981 and the Age Discrimination in Employment Act.

C. Award the Plaintiff lost salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses', cash awards, loss of retirement savings and benefits and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

D. Award the Plaintiff compensatory damages for emotional distress injuries and loss;

E. Award Plaintiff pecuniary and out of pocket expenses;

F. Order Defendant to pay all reasonable attorney's fees, court costs, and expenses incurred by Plaintiff as a result of Defendants' actions and inactions, as well as pre judgment and post-judgment interest; and

G. Order such other equitable and legal relief as the Court deems just and appropriate.

### Part VI. Jury Trial Demanded.

Plaintiff demands a jury trial for this action.

Respectfully Submitted,

/s/ A.J Dhali
Dhali PLLC
1828 L. Street. NW. Suite 600
Washington D.C. 20036
T: (202) 556-1285
F: (202) 351-0518
Email: ajdhali@dhalilaw.com
*Attorney for the Plaintiff Samuel Otis Pratt*
Friday November 4, 2016

## __Certificate of Service.__

Upon issuance of the Summons from this Court, copies of the Summons and Complaint will be mailed to:

(1) United States Department of Justice (DoJ). Attorney General Loretta Lynch
Rm B103. 950 Pennsylvania Ave. Washington D.C. 20530-0001

(2) United States Attorney for the District of Columbia
Channing D. Phillips
Attn: Civil Process Clerk
555 4th Street, NW. Washington, D.C 20530

(3) the U.S. Department of State
The Executive Office. Office of the Legal Advisor, S.A. -17
600 19th Street. NW. Suite 5.600. Washington D.C. 20522
Attn: Alicia Frechette, Ex. Director.

/s/ A.J Dhali